UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

BLAIR DAVIS-GARETT,                                      **Docket No.:**

              *Plaintiff*,                    <u>**COMPLAINT**</u>

    -against-                              **PLAINTIFF DEMANDS**
                                          <u>**A JURY TRIAL**</u>

URBAN OUTFITTERS, INC., and
ANTHROPOLOGIE, INC.,

              *Defendants*.
-------------------------------------------------------------------X

       Plaintiff, as and for her Complaint, respectfully alleges, all upon information and belief, as follows:

<h3 align="center"><u>JURISDICTION AND VENUE</u></h3>

       1.     This Court has original jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C. §1331, in that certain of the Plaintiff's claims arise under the laws of the United States, namely The Age Discrimination in Employment Act of 1967, 29 U.S.C. §623 (a)-1 et seq. ("the ADEA") and supplemental jurisdiction exists over the remainder of Plaintiff's claims under Chapter 18, Article 15 of the New York State Executive Law §296(1)(a) and (7) and Connecticut General Statute §46a-60(a)(1) and (a)(4), pursuant to 28 U.S.C. §1367.

       2.     Venue is proper under 42 U.S.C §2000e-5(f)(3) and 28 U.S.C §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

3.      Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission and the Connecticut Commission on Human Rights and Opportunities ("CHRO") on December 13, 2014 and the CHRO issued a release of jurisdiction on November 19, 2015.

## IDENTITY OF PARTIES

4.      Plaintiff Blair Davis-Garett ("Garett"), a current resident of the County, City and State of New York, was employed by Defendants until her unlawful termination on or around October 4, 2013, when she was 55 years of age.

5.      Defendant Urban Outfitters, Inc., is a domestic corporation authorized to do business in the State of New York that maintains locations throughout the world, offering women's and men's fashion apparel, footwear, beauty products, accessories, activewear and housewares, which largely draw from bohemian, hipster, ironically humorous, kitschy, retro, and vintage styles, and offers numerous brands, including Urban Outfitters, Anthropologie, Free People, BHLDN and Terrain.

6.      Defendant Anthropologie, Inc., is a domestic corporation authorized to do business in the State of New York that serves as the "lifestyle" brand of Urban Outfitters, Inc., and has over 200 stores worldwide featuring an assortment of women's apparel and accessories, home furnishings, décor and gifts.

7.      As set forth herein, Garett was employed by and worked for Urban Outfitters, Inc., at various Anthropologie locations identified herein, so that both Defendants are collectively referred

to herein as "Anthropologie."

## BACKGROUND RELEVANT TO ALL CAUSES OF ACTION

8.      Garett commenced her employment with Anthropologie on or around September 3, 2012, as a sales associate at its store located in the Roosevelt Field shopping mall, located on Long Island, New York.

9.      Garett was hired to work as seasonal a sales associate, on a part-time basis for the upcoming holiday season, though Garett made it clear that she was seeking full-time employment.

10.      At all relevant times, Garett was qualified for her position at Anthropologie, as confirmed by the positive feedback that she received, the fact that she was hired to work full-time with additional responsibilities and the promotion she earned during her employment.

11.      Garett, who was 54 years of age when she was hired, was significantly older than the other employees with whom she worked, including the Store Manager, Jennifer Rodibaugh ("Rodibaugh"), who, upon information and belief, was in her 20s.

12.      Rodibaugh, the Store Manager, would treat Garett differently than her younger colleagues, which included consistently assigning Garett to work the fitting room area of the store, which was the least desirable assignment.

3

13.     Garett, however, continued to perform her duties satisfactorily and advised Anthropologie that she had been an award-winning Art Director at several national magazines and was looking to advance.

14.     In or around early January 2013, Anthropologie announced that the store located in the Roosevelt Field Mall would be closing and that employees assigned to that store would be moved to other locations.

15.     Garett's younger colleagues were moved to stores located on Long Island, including in Huntington and Greenvale, but Rodibaugh told Garett that her only option was to apply for a position at the store located in White Plains, Westchester County, which was a substantial distance farther from Garett's home on Long Island, which Garett was told was where she would have "the ability" to get the most hours and "grow the most."

16.     Garett, therefore, began working at the Anthropologie location in White Plains on or around January 29, 2013, reporting to the Manager, Kelly Bentley ("Bentley"), who was in her early 30s.

17.     In order to get to the White Plains location from her home on Long Island, Garett was required to drive a substantial distance and was also required to pay for tolls, gas and parking, but she did so in order to demonstrate her commitment to Anthropologie and her strong desire to grow within the company.

4

18.     Garett again proved her abilities at the White Plains location, which included having Bentley tell her that she was good with sales and being given increased responsibilities as a "personal shopper," though without the increased compensation that normally accompanied such a position.

19.     Garett also demonstrated her positive performance by preparing a "fit book," in which she analyzed the various garments sold by Anthropologie that would advise associates on the fit of various clothing styles to help them assist customers, and Anthropologie's managers used Garett's fit book and Garett's co-workers advised her that her efforts had helped them.

20.     Despite her positive performance, Garett was given the less desirable assignments, including working the fitting room, and was also given the unenviable task of cleaning up a dirty tampon that was left in the fitting room and feces that was on the sales floor, none of which was required of her younger co-workers.

21.     Although Garett repeatedly expressed her desire to move up in the company, an opening for an Apparel Supervisor position was not discussed with her and, instead a much younger woman in her early 20s named "Alexa" was hired from outside the company for the position and, in fact, Garett assisted in training her.

22.     In or around June 2013, Garett learned about an opening for an Apparel Supervisor at the White Plains location and she expressed her interest in the position to Bentley.

5

23.     Bentley's reaction to Garett's interest in the promotion was negative and revealed her discriminatory belief that Garett would not be an appropriate candidate for a managerial position because of her age, and included Bentley stating, by way of example:

- Informing Garett that she should not reasonably expect to obtain a promotion because, "This is a young company. Everyone's young. The people that work here are young."

- Telling Garett she would not "fit in," and saying, "Oh, Blair, look around at the people that work here. Look at the District Manager, look at how young she is. Look at the people that work here, they're young."

- "There are no Managers who are your age," pointing to a District Manager who Bentley said "is only in her 20s."

- Claiming Garett would not be physically fit to be a manager because of her age, saying, "You're not going to have the stamina to be a Manager. You're going to have to start doing a lot of closings. Are you going to be able to do that?"

- Saying, "The only reason you're in this store is because of this store's demographics. This store has an older demographic and that's why you're here."

- Asking Garett what her goals were and where did she want to end up, saying, "Do you want to be a store manager? I don't see that for you. I don't think you could really do that," and being unable to answer Garett as to why Garett could not be a store manager.

24.     Garett was shocked and began crying because of Bentley's blatantly discriminatory remarks and said, "You cannot legally say that to me," yet Bentley persisted, saying, "But it's true. Look around," making it painfully clear to Garett that while she could remain employed as an associate, Bentley believed that Garett's age would prevent her from ever rising within the company.

6

25.     Garett stated that she performed very well and was a great employee and, "You can't tell me I'm not going to be promoted because of my age," but Bentley continued that "everyone here is really young," which clearly signaled that Garett's age was preventing her from even being considered for advancement within Anthropologie.

26.     Immediately after her upsetting meeting with Bentley, Garret immediately called Anthropologie's "1-800-now-prev" complaint hotline to complain about age discrimination, and left a voicemail saying that she was told she was not getting a promotion because of her age and asked for a transfer.

27.     Several days later, Garett, received a call back from the District Manager, Amy Shearer ("Shearer"), who was in her early 30s, who told Garett she would "talk" to Bentley.

28.     Several weeks later, Garett was "interviewed" for the Apparel Supervisor position by Matt Mol, who was approximately 30 years old, though this interview was perfunctory and was done in the middle of the sales floor while the store was open, since Anthropologie was only considering Garett for the position because she had complained about age discrimination.

29.     Bentley then told Garett that she would be the Apparel Supervisor, though Bentley made her retaliatory animus clear by, among other things, telling Garett that she had a "special" way of training new managers that involved, during the first 20 shifts, doing 10 consecutive openings and then 10 consecutive closings, a very demanding task that Shearer, the District Manager, told Garett

she had never heard of being required.

30.     Garett was not given any kind of other training or job description and Bentley told her that she would have to "figure it out for [herself]," confirming that Bentley had no interest in helping Garret succeed in her new position.

31.     Approximately 10 days later, on or about July 9, 2013, Bentley called Garett into a meeting and said, "You are one of the worst managers ever.  You are not fit to be a manager.  You do not know what you're doing," and that Garett was "not walking fast enough on the floor" and was "not cut out" to be a supervisor.

32.     Bentley's hostility and degrading comments were in clear retaliation for Garett's complaint of age discrimination, and were intended to create a pretext of poor performance against Garett, to punish her for protesting Bentley's discriminatory conduct.

33.     Bentley's conduct further demonstrated her animus against Garett because of Garett's age and complaints of age discrimination, as confirmed by the fact that Garett was consistently assigned the least desirable assignments and hours, while the significantly younger and less experienced Supervisor that Garett had helped train was treated much more favorably.

34.     Bentley also sought to set Garett up to fail by, for example, telling Garett that she would be "training" Garett in the fitting room, only to later tell Garett that it had been an audit and

that Garett had failed the audit, based on Bentley's distorted and biased desire to concoct a paper trail against Garett.

35.     During this period of time, Garett also became aware of an opening for an Apparel Supervisor at an Anthropologie location in Edgewater, New Jersey, and reasonably believed that she could obtain that position, which was something that she desired and so informed Anthropologie and, in fact, Garett interviewed with the District Manager in New Jersey, Jen Ernst ("Ernst") in or around August 2013, which interview Garett believed went well.

36.     Approximately one week after her interview with Ernst for the position in Edgewater, Bentley called Garett into her office and told Garett her "transfer had come through," and that she would be going to the store in Greenwich, Connecticut, which Garett had never before discussed or expressed any interest in being assigned.

37.     Garett was refused a transfer to the store where she believed she could succeed and instead was transferred to a location that Anthropologie reasonably knew was far from her home in retaliation for her complaints of age discrimination.

38.     Bentley told Garett that, instead of going to New Jersey, she was being assigned to the Greenwich location, saying, "We think you'll do well there because of the demographic."

39.     Bentley's reference to Garett's transfer to the Greenwich store because of that location's "demographic" was a clear reference to Garett's age and confirmed that Garett's age was, once again, the reason for Anthropologie's actions against her.

40.     Garett again called Anthropologie's 1-800-now-prev hotline and Shearer, the District Manager, called Garett and, when Garett asked why she was being sent to the Greenwich store, which was farther away from her home, instead of to the Edgewater location, where the Manager had already expressed a desire to have Garett work there and to where Garett was willing to commute, Shearer became angry and said, "That's your only option, take it or leave."

41.     In or around August 2013, therefore, Garett began working at the Anthropologie store located in Greenwich, Connecticut, once again reporting to Rodibaugh, to whom she had previously reported while working at the Roosevelt Field mall, and Rodibaugh told Garett, "I'll take you," as if no one else would, which was degrading to Garett.

42.     The Greenwich store did not have an opening for an Apparel Supervisor, which made it clear that there was no legitimate reason for Garett to be assigned to that store.

43.     Rodibaugh did not provide Garett with any training or even show her around the store, and instead almost immediately assigned Garett to the fitting room, which was the same undesirable assignment she had given to Garett at the Roosevelt Field location, and to do more closing shifts than other employees, while the more desirable assignments and shifts were given to

10

the significantly younger employees.

44.     When Garett refused to leave Anthropologie's workplace and continued to work at the Greenwich location, Anthropologie concocted a pretext to terminate her employment, because of her age and complaints of discrimination.

45.     Garett was terminated on or about October 7, 2013.

46.     The baseless reason Anthropologie offered for terminating Garett was that several days earlier, on October 3, 2013, Garett called the Greenwich police for help after a male customer had behaved in a manner that was alarming and threatening to Garett and her staff.

47.     Specifically, late that evening, on a night when Garett was responsible for closing the store, a man began to act strangely, walking in and out of the store on his cell phone and putting a finger to his mouth to shush a female sales associate, which was particularly concerning to Garett and the two other sales associates since there had been shoplifters at the store in the prior weeks, and Garett contacted the police to request a police car monitor the parking lot for the time when Garett and her co-workers, who were all women, would leave the store.

48.     Anthropologie distorted and manipulated this incident as the basis for Garett's termination, even though all she did was act reasonably to ensure the safety of herself and her co-workers who were closing the store, and Garett said that she would have done the same thing again.

11

49.     Anthropologie outrageously told Garett that the only time she was permitted to call the police was when there was a gun to her head and that she should have barred the police from coming into the store, which was completely unreasonable and demonstrated that Anthropologie was enlarging the issue to concoct a reason for her termination.

50.     Despite acting reasonably that evening, Garett was fired on October 7, 2013, by Rodibaugh and another Manager who stated, "We are letting you go, this is your third and final warning" – even though Garett had never been written up or reprimanded in any way – and Rodibaugh confirmed that Garett was being terminated, saying, "It's over."

51.     As a result of Anthropologie's discriminatory and retaliatory conduct, Garett, among other things and only by way of example, has been caused to suffer the profound and lasting stigma of dismissal; the financial loss Garett has and will continue to sustain; the grief and emotional unrest Garett has already and will continue to sustain.

52.     The damage inflicted upon Garett was a direct and proximate result of Anthropologie's unlawful age discrimination and retaliation has and will cause her a loss of income, emotional distress and has severely impacted the quality of her life and her career.

53.     Here, the acts of Anthropologie were so egregious and were done so clearly in the face of a perceived risk that its actions would violate Garett's protected rights under the law, that, in addition to all the damages inflicted upon Garett and in addition to all the measure of relief to

which Garett may properly be entitled herein, Anthropologie should also be required to pay punitive damages as punishment for its discriminatory conduct, in order to deter Anthropologie and others similarly situated from engaging in such conduct in the future.

### AS AND FOR THE FIRST CAUSE OF ACTION ON BEHALF OF GARETT AGAINST ANTHROPOLOGIE FOR AGE DISCRIMINATION IN VIOLATION OF THE ADEA

54.     Garett repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 53 of this Complaint, as though fully set forth at length herein.

55.     At all relevant times, Garett was in a protected category under The Age Discrimination in Employment Act of 1967, 29. U.S.C. §623(a)(1) ("the ADEA"), because she was 55 years old at the time of her unlawful termination on or around October 4, 2013.

56.     Garett was fully qualified for her position and performed her duties in a satisfactory fashion and was in a position to continue doing so for the remainder of her career.

57.     Given the circumstances surrounding Garett's employment and termination, which include, among other things, Garett's Manager, Bentley, telling her that Garett should not seek a promotion because Anthropologie was a "really young company" and Garett would not "fit in" because she "wasn't as young as the other managers or the rest of the company," and that the White Plains location was "the only store [Garett] could work in because they have an older demographic," and Garett was given less favorable assignments and treated in a degrading fashion in comparison

to her much younger co-workers, there is a very real inference that Garett was discriminated against because of her age.

58.     In addition to her termination, which was adverse employment action, Anthropologie is liable to Garett for the age discrimination she suffered in her workplace because Anthropologie engaged in unlawful conduct that created a hostile work environment that was sufficiently severe or pervasive so as to alter the terms, conditions, and privileges of Garett's employment.

59.     The hostile environment created and allowed by Anthropologie, which Garett reasonably perceived to be hostile, would also be perceived as hostile by any reasonable person.

60.     Anthropologie was obligated to maintain a workplace free of age discrimination and hostility and to prevent its managerial employees from violating any laws designed to prevent unlawful discrimination in employment and, therefore, is legally responsible and liable to Garett for the acts of its management that culminated in her termination in violation of the ADEA.

61.     The aforementioned acts of Anthropologie constitute unlawful discrimination on the basis of age against Garett in violation of the ADEA, 29 U.S.C. §623(a)(1), which provides, *inter alia*, that:

>It shall be unlawful for an employer (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; (2) to limit, segregate, or classify his employees in any way which would

deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age . . .

62.     In addition to suffering a significant loss of income and benefits, Garett has been personally and professionally humiliated, demeaned and degraded, all of which was caused by Anthropologie's conduct in violation of Garett's human rights.


63.     As a direct and proximate result of Anthropologie's conduct complained of herein, and as alleged in this cause of action, as well as the conduct set forth in this Complaint, Garett has suffered damages, injuries and losses, both actual and prospective, which include the irreparable loss of income for the remainder of her working career, damage to her career and the emotional pain and suffering Garett has been caused to suffer, so that Garett seeks in this Cause of Action compensatory damages in an amount to be determined at a trial of this matter, as well as reasonable attorney's fees, the costs of this action and pre-judgment interest.


64.     Here, the acts of Anthropologie were done so clearly with reckless indifference in the face of a perceived risk that its actions would violate Garett's protected rights under the ADEA so that, in addition to all the damages inflicted upon Garett and in addition to all the measures of relief to which Garett may properly be entitled herein, Anthropologie should also be required to pay punitive damages in an award to be determined at a trial of this matter as punishment for its discriminatory conduct, in order to deter Anthropologie and others similarly situated from engaging in such conduct in the future.

## AS AND FOR THE SECOND CAUSE OF ACTION ON BEHALF OF GARETT AGAINST ANTHROPOLOGIE FOR AGE DISCRIMINATION IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW

65.     Garett repeats, re-alleges and incorporates in full paragraphs 1 through 53 of this Complaint, as though fully set forth at length herein.

66.     The entirety of the acts which constitute and form this cause of action were perpetrated upon Garett while she was in the course of her employment with Anthropologie.

67.     At all relevant times, Garett was in protected category under the New York State Executive Law §296(1)(a) because of her age, which was 55 years old at the time of her unlawful termination on October 7, 2013.

68.     Garett was fully qualified for her position and performed her duties in that position in a totally satisfactory fashion and was in a position to continue doing so for the remainder of her career.

69.     Given the circumstances surrounding Garett's employment and termination, which include, among other things, Garett's Manager, Bentley, telling her that Garett should not seek a promotion because Anthropologie was a "really young company" and Garett would not "fit in" because she "wasn't as young as the other managers or the rest of the company," and that the White Plains location was "the only store [Garett] could work in because they have an older demographic,"

16

and Garett was given less favorable assignments and treated in a degrading fashion in comparison to her much younger co-workers, there is a very real inference that Garett was discriminated against because of her age.

70.     In addition to her termination, which was adverse employment action, Anthropologie is liable to Garett for the age discrimination she suffered in her workplace because it created and permitted a hostile work environment that was sufficiently severe or pervasive so as to alter the terms, conditions, and privileges of Garett's employment.

71.     The hostile environment created and allowed by Anthropologie, which Garett reasonably perceived to be hostile, would also be perceived as hostile by any reasonable person.

72.     Anthropologie was obligated to maintain a workplace free of age discrimination and hostility and to prevent its managerial employees from violating any laws designed to prevent unlawful discrimination in employment and, therefore, is legally responsible and liable to Garett for the acts of its management in violation of New York State Executive Law §296(1)(a).

73.     The aforementioned acts of Anthropologie constitute unlawful age discrimination against Garett in violation of Chapter 18, Article 15 of the New York State Executive Law §296(1)(a) (referred to as "the New York State Human Rights Law"), which provides, inter alia, that:

> It shall be an unlawful discriminatory practice: (a) For an employer
> . . . because of the . . . age . . . of any individual . . . to discharge from
> employment such individual or to discriminate against such

individual in compensation or in terms, conditions or privileges of employment.

74.     As a direct result of Anthropologie's conduct complained herein, and as alleged in this cause of action, as well as the conduct set forth in this Complaint, Garett has been adversely affected in her life's normal pursuits, and Garett believes that the injuries inflicted upon her as a direct result of the occurrences complained of herein have, and will continue to have, an irreparably devastating effect upon her well-being and quality of life, for which Anthropologie should be required to pay Garett the sum of Three Million ($3,000,000) Dollars in compensatory damages.

**AS FOR THE THIRD CAUSE OF ACTION ON BEHALF OF
GARETT AGAINST ANTHROPOLOGIE FOR AGE DISCRIMINATION
IN VIOLATION OF CONN. GEN. STAT §46a-60(a)(1)**

75.     Garett repeats, re-alleges and incorporates in full paragraphs 1 through 53 of this Complaint as though fully set forth at length herein.

76.     At the time Garett was subjected to the discriminatory conduct described herein, she was in a protected class under Connecticut General Statue §46a-60(a)(1) because of her age, which was 55 at the time of her termination.

77.     Throughout the time of her employment with Anthropologie and up to the time of her termination, Garett was fully qualified for her position and was in a position to continue working in that capacity for the remainder of her career.

18

78.     Anthropologie took adverse employment action against Garett, which culminated in her termination on October 7, 2013.

79.     Given the circumstances surrounding Garett's employment and termination, which include, among other things, Garett's Manager, Bentley, telling her that Garett should not seek a promotion because Anthropologie was a "really young company" and Garett would not "fit in" because she "wasn't as young as the other managers or the rest of the company," and that the White Plains location was "the only store [Garett] could work in because they have an older demographic," and Garett was given less favorable assignments and treated in a degrading fashion in comparison to her much younger co-workers, there is a very real inference that Garett was discriminated against because of her age.

80.     The aforementioned acts of Anthropologie constitute unlawful discrimination against Garett in violation of Connecticut General Statue §46a-60(a)(1), causing damages as pled, which provides, *inter alia* that:

> For an employer, by the employer or the employer's agent . . . to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . age;

81.     As a result of Anthropologie's violations of the in violation of Connecticut General Statue §46a-60(a)(1), Anthropologie is liable to Garett as provided under the law causing damages as pled.

82.    Garett has been caused to suffer injuries resulting in emotional anguish and suffering and she has been humiliated, demeaned and otherwise degraded because of Anthropologie's outrageous conduct in violation of Garett's human rights, all of which impacted her well-being and the quality of her life.

83.    As a direct and proximate result of Anthropologie's discriminatory conduct complained of herein, Garett has suffered damages, injuries and losses, both actual and prospective, which include damage to her career and the emotional pain and suffering she has been caused to suffer and continues to suffer.

84.    Garett, therefore, seeks judgment against Anthropologie on this Cause of Action, including, among other things, for compensatory damages, back-pay, front-pay, plus interest, reasonable costs and attorney fees pursuant to Connecticut General Statue §46a-104, and such other relief as the Court may deem just and proper.

**AS AND FOR THE FOURTH CAUSE OF ACTION ON
BEHALF OF GARETT AGAINST ANTHROPOLOGIE
FOR RETALIATION IN VIOLATION OF THE ADEA**

85.    Garett repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 53 of this Complaint, as though fully set forth at length herein.

86.    Each time that Garett opposed Anthropologie's discriminatory conduct, she was engaged in a protected activity under the law, of which Anthropologie was aware.

87.     As a causal and proximate result of Garett engaging in a protected activity under the law, Garett was subjected to retaliation and was ultimately terminated, all of which adversely and severely impacted upon her position, career and well-being, and which would be reasonably likely to deter a person from engaging in protected activity in the future.

88.     Garett's unlawful termination has adversely affected, her emotional well-being, the quality of life and her life's normal pursuits, and Garett believes that the injuries inflicted upon her, which were a direct result of the occurrences complained of herein, have and will continue to cause Garett significant damage.

89.     In addition to suffering a loss of income and benefits, Garett has been personally and professionally humiliated, demeaned and degraded, all of which has been caused by Anthropologie's conduct in violation of Garett's human rights.

90.     The aforementioned acts of Defendants constitute unlawful retaliation against Garett in violation of the ADEA, 29 U.S.C. §623(d), which provides, *inter alia*, that:

> It shall be unlawful for an employer . . . to discriminate against any of its employees . . . because such individual . . . has opposed any practice made unlawful by this section . . .

91.     As a direct and proximate result of Anthropologie's conduct complained of herein, and as alleged in this cause of action, as well as the conduct set forth in this Complaint, Garett has suffered damages, injuries and losses, both actual and prospective, which include the irreparable loss

of income for the remainder of her working career, damage to her career and the emotional pain and suffering Garett has been caused to suffer, so that Garett seeks in this Cause of Action compensatory damages in an amount to be determined at a trial of this matter, as well as reasonable attorney's fees, the costs of this action and pre-judgment interest.

92.     Here, the acts of Anthropologie was done so clearly with reckless indifference in the face of a perceived risk that its actions would violate Garett's protected rights under the ADEA, that, in addition to all the damages inflicted upon Garett and in addition to all the measures of relief to which Garett may properly be entitled herein, Anthropologie should also be required to pay punitive damages in an award to be determined at a trial of this matter as punishment for its retaliatory conduct, in order to deter Anthropologie and others similarly situated from engaging in such conduct in the future.

## AS AND FOR THE FIFTH CAUSE OF ACTION ON BEHALF OF GARETT AGAINST ANTHROPOLOGIE FOR RETALIATION IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW

93.     Garett repeats, re-alleges and incorporates in full paragraphs 1 through 53 of this Complaint, as though fully set forth at length herein.

94.     Each time that Garett opposed Anthropologie's discriminatory conduct, she was engaged in a protected activity under the law, of which Anthropologie was aware.

95.     As a causal and proximate result of Garett engaging in a protected activity under the law, Garett was subjected to retaliation and was ultimately terminated, all of which adversely and severely impacted upon her position, career and well-being, and which would be reasonably likely to deter a person from engaging in protected activity in the future.

96.     Garett's unlawful termination has adversely affected, her emotional well-being, the quality of life and her life's normal pursuits, and Garett believes that the injuries inflicted upon her, which were a direct result of the occurrences complained of herein, have and will continue to cause Garett significant damage.

97.     In addition to suffering a loss of income and benefits, Garett has been personally and professionally humiliated, demeaned and degraded, all of which has been caused by Anthropologie's conduct in violation of Garett's human rights.

98.     The aforementioned acts of Anthropologie constitute unlawful discriminatory retaliation against Garett in violation of the New York State Human Rights Law, §296(1)(e), which provides, *inter alia,* that:

>       It shall be unlawful discriminatory practice . . . for any employer . . . to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article . . .

99.     As a direct and proximate result of Anthropologie's violation of the New York State Human Rights Law, Garett was adversely affected in her employment, and did and continues to

23

suffer in her life's normal pursuits, and she believes that the actual and prospective injuries inflicted

upon her as a result of Anthropologie's discriminatory conduct and retaliation did and will continue

to have an irreparable devastating effect upon the quality of her life and career, and will prevent her

from functioning as she did prior to the conduct complained of herein, all of which Garett alleges

to be in the amount of Three Million ($3,000,000) Dollars.


### AS AND FOR A SIXTH CAUSE OF ACTION ON BEHALF OF GARETT AGAINST ANTHROPOLOGIE FOR RETALIATION IN VIOLATION OF CONN. GEN. STAT §46a-60(a)(4)

100.    Garett repeats, re-alleges and incorporates in full paragraphs 1 through 53 of this

Complaint as though fully set forth at length herein.


101.    Each time that Garett opposed Anthropologie's discriminatory conduct, she was

engaged in a protected activity under the law, of which Anthropologie was aware.


102.    As a causal and proximate result of Garett engaging in a protected activity under the

law, Garett was subjected to retaliation and was ultimately terminated, all of which adversely and

severely impacted upon her position, career and well-being, and which would be reasonably likely

to deter a person from engaging in protected activity in the future.


103.    Garett's unlawful termination has adversely affected, her emotional well-being, the

quality of life and her life's normal pursuits, and Garett believes that the injuries inflicted upon her,

which were a direct result of the occurrences complained of herein, have and will continue to cause

Garett significant damage.

104.    In addition to suffering a loss of income and benefits, Garett has been personally and professionally humiliated, demeaned and degraded, all of which has been caused by Anthropologie's conduct in violation of Garett's human rights.

105.    The aforementioned acts of Anthropologie constitute unlawful discriminatory retaliation against Garett in violation of Conn. Gen. Stat. §46a-60(a)(4), causing damages as pled, which states in pertinent part:

> (A)  It shall be a discriminatory practice in violation of this section:
>
> (4) For any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint or testified or assisted in any proceeding under section 46a-82, 46a-83 or 46a-84.

106.    As a result of Anthropologie's violations of the in violation of Connecticut General Statute §46a-60(a)(1), Anthropologie is liable to Garett as provided under the law causing damages as pled.

107.    As a direct and proximate result of Anthropologie's discriminatory conduct complained of herein, Garett has suffered damages, injuries and losses, both actual and prospective, which include damage to her career and the emotional pain and suffering she has been caused to suffer and continues to suffer.

108.    Garett, therefore, seeks judgment against Anthropologie on this Cause of Action, including, among other things, for compensatory damages, back-pay, front-pay, plus interest, reasonable costs and attorney fees pursuant to Connecticut General Statute §46a-104, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** Garett demands judgment against Anthropologie on the First Cause of Action for compensatory and punitive damages in an amount to be determined at a trial of the matter, plus reasonable attorney's fees, costs and pre-judgment interest as are permitted; on the Second Cause of Action in the sum of Three Millions ($3,000,000) Dollars for compensatory damages, plus costs and pre-judgment interest; on the Third Cause of Action for compensatory damages in an amount to be determined at trial, plus costs, attorney's fees and pre-judgment interest; on the Fourth Cause of Action for compensatory and punitive damages in an amount to be determined at a trial of the matter, plus reasonable attorney's fees, costs and pre-judgment interest as are permitted; on the Fifth Cause of Action in the sum of Three Million ($3,000,000) Dollars for compensatory damages, plus costs and pre-judgment interest; on the Sixth Cause of Action for compensatory damages in an amount to be determined at trial, plus costs, attorney's fees and pre-judgment interest; and for such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury.

**SCHWARTZ & PERRY, LLP**
*Attorneys for Plaintiff*

By:____/s/_____
    BRIAN HELLER (BH 4004)
    DAVIDA S. PERRY (DSP 1879)
    295 Madison Avenue
    New York, New York 10017
    (212) 889-6565
